# EXHIBIT 1

**[ORAL ARGUMENT SCHEDULED FOR MARCH 22, 2006]**

**Nos. 05-5064, 05-5095 through 05-5116**
**Nos. 05-5062, 05-5063**

_____
_____

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**
_____

**KHALED A.F. AL ODAH, et al.,**
                    **Petitioners-Appellees/Cross-Appellants,**
                    **v.**
**UNITED STATES OF AMERICA, et al.,**
                    **Respondents-Appellants/Cross-Appellees.**
_____

**LAKHDAR BOUMEDIENE, et al.,**
                    **Petitioners-Appellants,**
                    **v.**
**GEORGE W. BUSH, et al.,**
                    **Respondents-Appellees.**
_____

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**
_____

**SUPPLEMENTAL BRIEF OF THE FEDERAL PARTIES**
**ADDRESSING THE DETAINEE TREATMENT ACT OF 2005**
_____

**PAUL D. CLEMENT**
*Solicitor General*

**PETER D. KEISLER**
*Assistant Attorney General*

**GREGORY G. KATSAS**
*Deputy Assistant Attorney General*

**DOUGLAS N. LETTER**
 **(202) 514-3602**
**ROBERT M. LOEB**
 **(202) 514-4332**
**CATHERINE Y. HANCOCK**
 **(202) 514-3469**
*Attorneys, Appellate Staff*
*Civil Division, Room 7268*
*U.S. Department of Justice*
*950 Pennsylvania Ave., N.W.*
*Washington, D.C. 20530-0001*

_____
_____

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . iii

GLOSSARY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . x

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

PROVISIONS AT ISSUE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

STATEMENT OF FACTS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

SUMMARY OF ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

    I.    THE DETAINEE TREATMENT ACT APPLIES TO,
        AND RESTRICTS JURISDICTION IN, THESE
        PENDING CASES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

        A.    This Act Gives This Court "Exclusive" Jurisdiction
              Over Claims By The Guantanamo Detainees "Pending
              On" The Date Of Its Enactment . . . . . . . . . . . . . . . . . . . . . 21

        B.    The Act Eliminates Habeas Jurisdiction Without Any
              Reservation For Pending Cases . . . . . . . . . . . . . . . . . . . . . 28

        C.    Petitioners' Other Arguments For Continuing Habeas
              Jurisdiction Lack Merit . . . . . . . . . . . . . . . . . . . . . . . . . . . 37

II.    THE ACT DOES NOT VIOLATE THE SUSPENSION
       CLAUSE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

III.   THIS COURT SHOULD DETERMINE THE MERITS
       OF PETITIONERS' CONSTITUTIONAL AND AUMF
       CLAIMS, WHICH ARE WITHIN ITS EXCLUSIVE
       JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 58

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)
       OF THE FEDERAL RULES OF APPELLATE PROCEDURE

CERTIFICATE OF SERVICE

ADDENDUM

# TABLE OF AUTHORITIES

**Page**

<u>Cases</u>:

<u>32 County Sovereignty Comm.</u> v. <u>Dep't of State</u>, 292 F.3d 797
(D.C. Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

<u>Acree</u> v. <u>Iraq</u>, 370 F.3d 41 (D.C. Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

<u>Ahrens</u> v. <u>Clark</u>, 335 U.S. 188 (1948) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 48

<u>Al Odah</u> v. <u>United States</u>, 321 F.3d 1134 (D.C. Cir. 2003) . . . . . . . . . . . . . . . . . 10

<u>Alvarez-Barajas</u> v. <u>Gonzales</u>, 418 F.3d 1050 (9th Cir. 2005) . . . . . . . . . . . . . . 54

<u>Arizonans for Official English</u> v. <u>Arizona</u>, 520 U.S. 43 (1997) . . . . . . . . . . . . . 20

<u>Assessors</u> v. <u>Osbornes</u>, 76 U.S. (9 Wall.) 567 (1869) . . . . . . . . . . . . . . . . . . . . 31

<u>Beck</u> v. <u>Prupis</u>, 529 U.S. 494 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

<u>Bonhometre</u> v. <u>Gonzales</u>, 414 F.3d 442 (3d Cir. 2005) . . . . . . . . . . . . . . . . . . . . 54

<u>Braden</u> v. <u>30th Judicial Circuit Court of Kentucky</u>,
410 U.S. 484 (1973) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10, 48

*<u>Bruner</u> v. <u>United States</u>, 343 U.S. 112 (1952) . . . . . . . . . . . . . . . . . . . 30, 32, 38

<u>Church of Scientology of Cal.</u> v. <u>IRS</u>, 484 U.S. 9 (1987) . . . . . . . . . . . . . . . . . . 42

<u>CRLP</u> v. <u>Bush</u>, 304 F.3d 183 (2d Cir. 2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

<u>Cuban Am. Bar Ass'n.</u> v. <u>Christopher</u>, 43 F.3d 1412 (11th Cir. 1995) . . . . . . . . 46

---

* Authorities upon which we chiefly rely are marked with an asterisk.

Ex Parte Bollman, 8 U.S. (4 Cranch.) 75 (1807) . . . . . . . . . . . . . . . . . . . . . . . . . 49

Ex Parte McCardle, 74 U.S. (7 Wall.) 506 (1868) . . . . . . . . . . . . . . . . . . . . . . 20, 31

*Ex parte Quirin, 317 U.S. 1 (1942) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

FCC v. ITT World Communications, Inc., 466 U.S. 463 (1984) . . . . . . . . . . . . 22

FEA v. Algonquin SNG, Inc., 426 U.S. 548 (1976) . . . . . . . . . . . . . . . . . . . . . . 41

*Felker v. Turpin, 518 U.S. 651 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Gallardo v. Santini Fertilizer Co., 275 U.S. 62 (1927) . . . . . . . . . . . . . . . . . . . . 31

Gegiow v. Uhl, 239 U.S. 3 (1915) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

Gittens v. Menifee, 428 F.3d 382 (2d Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . 53, 54

Gonzales v. Oregon, 126 S. Ct. 904 (2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

*Hallowell v. Commons, 239 U.S. 506 (1916) . . . . . . . . . . . . . . . . . . . . . 31, 33, 34

Hamdan v. Rumsfeld, 415 F.3d 33 (D.C. Cir. 2005) . . . . . . . . . . . . . . . . . . . . . 53

Hamdi v. Rumsfeld, 542 U.S. 507 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 52

Hammontree v. NLRB, 925 F.2d 1486 (D.C. Cir. 1991) . . . . . . . . . . . . . . . . . . 43

Hughes Aircraft Co. v. U.S. ex rel. Schumer, 520 U.S. 939 (1997) . . . . . . . . 32, 33

INS v. St. Cyr, 533 U.S. 289 (2001) . . . . . . . . . . . . . . . . . . . . . . . . 29, 47-49, 53

Jackson v. Virginia, 443 U.S. 307 (1979) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Johnson v. Eisentrager, 339 U.S. 763 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . 9, 46

Kolster v. INS, 101 F.3d 785 (1st Cir. 1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

Koon's Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50 (2004) . . . . . . . . . . . . . . 42

*LaFontant v. INS, 135 F.3d 158 (D.C. Cir. 1998) . . . . . . . . . . . . . . . . . 31, 34, 40

Laing v. Ashcroft, 370 F.3d 994 (9th Cir. 2004) . . . . . . . . . . . . . . . . . . . . . . . . 22

*Landgraf v. USI Film Products, 511 U.S. 244 (1994) . . . . . . . . 29-31, 36, 38, 44

Lindh v. Murphy, 521 U.S. 320 (1997) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38-40

Lonchar v. Thomas, 517 U.S. 314 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

Lopez v. Heinauer, 332 F.3d 507 (8th Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . 22

Martin v. Hadix, 527 U.S. 343 (1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

Mitchell v. Maurer, 293 U.S. 237 (1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

Nichols v. Board of Trustees of Asbestos Local 24 Pension Plan,
    835 F.2d 881 (D.C. Cir. 1987) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

North Haven Bd. Of Educ. v. Bell, 456 U.S. 512 (1982) . . . . . . . . . . . . . . . . . . 41

People's Mojahedin Org. of Iran v. Department of State,
    182 F.3d 17 (D.C. Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Railroad Co. v. Grant, 98 U.S. (8 Otto) 398 (1878) . . . . . . . . . . . . . . . . . . . . . . 31

Ramallo v. Reno, 114 F.3d 1210 (D.C. Cir. 1997) . . . . . . . . . . . . . . . . . . . . . . . 57

Rasul v. Bush, 215 F. Supp. 2d 55 (D.D.C. 2002) . . . . . . . . . . . . . . . . . . . . . . . . 9

*Rasul v. Bush, 542 U.S. 466 (2004) . . . . . . . . . . . . . . . . . . . . . . . . . . . 3, 10, 47, 48

Republic National Bank of Miami v. United States, 506 U.S. 80 (1992) . . . . . . 30

Republic of Austria v. Altmann, 541 U.S. 677 (2004) . . . . . . . . . . . . . . . . . . 31, 40

Rosles v. BICE, 426 F.3d 733 (5th Cir. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 54

Santos v. Territory of Guam, __ F.3d __, 2006 WL 118375
        (9th Cir. Jan. 3, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32, 40

Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19 (1988) . . . . . . . . . . . . . . 43

Sherman v. Grinnell, 123 U.S. 679 (1887) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) . . . . . . . . . . . . . 20, 56

*Swain v. Pressley, 430 U.S. 372 (1977) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48, 50

Telecommunications Research and Action Ctr. v. FCC,
        750 F.2d 70 (D.C. Cir. 1984) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

Thunder Basin Coal Co. v. Reich, 510 U.S. 200 (1994) . . . . . . . . . . . . . . . . . . . 22

United States v. Erika, Inc., 456 U.S. 201 (1982) . . . . . . . . . . . . . . . . . . . . . . . . 23

United States v. Munsingwear, Inc., 340 U.S. 36 (1950) . . . . . . . . . . . . . . . . . . 57

United States v. The Schooner Peggy, 5 U.S. (1 Cranch) 103 (1801) . . . . . . 34, 35

United States v. Verdugo-Urquidez, 494 U.S. 259 (1990) . . . . . . . . . . . . . . . . . 45

Whitman v. American Trucking Ass'ns, 531 U.S. 457 (2001) . . . . . . . . . . . . . . 25

*Yamashita v. Styer, 327 U.S. 1 (1946) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51, 52

## **Constitution:**

Fifth Amendment . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45, 46, 55, 56

Suspension Clause . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18, 45-50, 53

**Statutes:**

5 U.S.C. § 703 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

10 U.S.C. § 113(d) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 25

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

28 U.S.C. § 1292(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 21

28 U.S.C. § 1331 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10

28 U.S.C. § 2241 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 9, 10, 14, 47

28 U.S.C. § 2241(c)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

Authorization for Use of Military Force, Pub. L. No. 107-40,
    115 Stat. 224 (Sept. 18, 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006,
    119 Stat. 2680, 2739-45 (2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2, 5, 14

    § 1005(a)(1)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 26

    § 1005(a)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 26

    § 1005(a)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

    § 1005(b) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 27

    § 1005(b)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    § 1005(b)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

    § 1005(e)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

    § 1005(e)(2) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . passim

§ 1005(e)(2)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 21, 23, 25, 28

§ 1005(e)(2)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

§ 1005(e)(2)(B)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23, 25

§ 1005(e)(2)(C) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 22, 55

§ 1005(e)(2)(C)(i) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 56

§ 1005(e)(2)(C)(ii) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 50, 55, 56

§ 1005(e)(3) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15, 38-40

§ 1005(e)(3)(A) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 15

§ 1005(e)(3)(D) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 39

§ 1005(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 37

§ 1005(h)(1) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 29, 37-39, 41

§ 1005(h)(2) . . . . . . . . . . . . . . . . . . . . . . . . . 16, 17, 21, 24, 28, 36-39, 41, 45

**Regulations:**

32 C.F.R. § 341.1 (2002) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

**Legislative Materials:**

151 Cong. Rec. S12652 (Nov. 10, 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40-43

151 Cong. Rec. S12752 (Nov. 14, 2005) . . . . . . . . . . . . . . . . . . . . . . . 41, 42, 44

151 Cong. Rec. S14256 (Dec. 21, 2005) . . . . . . . . . . . . . . . . . 4, 14, 41, 43, 44, 54

152 Cong. Rec. S970 (Feb. 9, 2006) . . . . . . . . . . . . . . . . . . . . . . . . . 41, 43, 54

**Miscellaneous:**

Administrative Review Implementation
    Directive, http://www.defenselink.mil/news/Sep2004
    /d20040914adminreview.pdf . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8, 9, 27

ARB Summary,
    http://www.defenselink.mil/news/Jan2006/d20060130arb.pdf . . . . . . . . . 9

ARB-2 Summary,
    http://www.defenselink.mil/news/Jan2006/d20060216arb2.pdf . . . . . . . . 9

CSRT Summary,
    http://www.defenselink.mil/news/Mar2005/d20050329csrt.pdf. . . . . . . . 8

Department of Defense Directive 5105.02 (2006) . . . . . . . . . . . . . . . . . . . . . . . 26

Friendly, Is Innocence Irrelevant?  Collateral Attack on Criminal
    Judgments, 47 U. Chi. L. Rev. 142 (1970) . . . . . . . . . . . . . . . . . . . . . . . . 48

Note, Developments in the Law--Federal Habeas Corpus,
    83 Harv. L.Rev. 1038 (1970) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Oaks, Legal History in the High Court--Habeas Corpus,
    64 Mich. L. Rev. 451 (1966) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Opinion on the Writ of Habeas Corpus, Wilm 77, 97 Eng. Rep. 29
    (H.L.1758) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

Signing Statement, 2005 WL 3562509 (Dec. 30, 2005) . . . . . . . . . . . . . . . . 41, 44

# GLOSSARY

ARB . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Administrative Review Board

AEDPA  . . . . . . . . . . . . . . . . . . . .    Antiterrorism and Effective Death Penalty Act

AUMF  . . . . . . . . . . . . . . . . . . . . . . . . . . . . Authorization for Use of Military Force

CSRT . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Combatant Status Review Tribunal

JA . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .    Joint Appendix

IN THE UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————————

Nos. 05-5064, 05-5095 through 05-5116
Nos. 05-5062, 05-5063

———————————————

KHALED A.F. AL ODAH, et al.,
Petitioners-Appellees/Cross-Appellants,
v.
UNITED STATES OF AMERICA, et al.,
Respondents-Appellants/Cross-Appellees.

———————————————

LAKHDAR BOUMEDIENE, et al.,
Petitioners-Appellants,
v.
GEORGE W. BUSH, et al.,
Respondents-Appellees.

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————————

SUPPLEMENTAL BRIEF OF THE FEDERAL PARTIES
ADDRESSING THE DETAINEE TREATMENT ACT OF 2005

———————————————

The government files this Supplemental Brief pursuant to the Court's order

of January 27, 2006.

## STATEMENT OF JURISDICTION

Petitioners are aliens detained by the Department of Defense at Guantanamo Bay, Cuba. Their detention is based on decisions by military Combatant Status Review Tribunals (CSRTs) that petitioners are enemy combatants against the United States. Petitioners sought to challenge their detention in the District Court for the District of Columbia, and they invoked that court's jurisdiction under 28 U.S.C. §§ 1331 and 2241.

The Government filed motions to dismiss the claims of all detainees. In the orders under review here, the district court in Al Odah granted the motions in part and denied them in part, and the district court in Boumediene granted the motions in full. When these appeals were initially briefed and argued, this Court had jurisdiction in Al Odah under 28 U.S.C. § 1292(b), and it had jurisdiction in Boumediene under 28 U.S.C. § 1291.

On December 30, 2005, while the appeals remained pending, Congress enacted the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45 (2005). As explained in this brief, that Act grants this Court exclusive jurisdiction to review the CSRT decisions to detain petitioners as enemy combatants. At the same time, the Act eliminates any other jurisdictional basis, including habeas corpus, for this Court or the district court to consider petitioners' claims.

## STATEMENT OF THE ISSUES

1.  Whether Section 1005 of the Detainee Treatment Act applies to cases pending on the date of its enactment, including these cases.

2.  Whether Section 1005 of the Detainee Treatment Act violates the Suspension Clause of the Constitution.

3.  If the Act applies here, whether these appeals should be dismissed for lack of jurisdiction or converted into petitions for review under the Act.

## STATEMENT OF THE CASE

These appeals involve challenges to the detention of aliens as enemy combatants outside the sovereign territory of the United States during ongoing armed conflict.  In <u>Rasul</u> v. <u>Bush</u>, 542 U.S. 466 (2004), the Supreme Court held that the federal habeas corpus statute extends to aliens detained as enemy combatants on a United States military base at Guantanamo Bay, Cuba.  In the wake of that decision, more than 200 habeas corpus actions involving more than 300 Guantanamo Bay detainees have been filed.  In these appeals alone, petitioners have raised claims under the Fifth Amendment, the Authorization for Use of Military Force (AUMF), the federal habeas statute, and the Third and Fourth Geneva Conventions.  They have asserted that any military process used to identify alien enemy combatants abroad must afford protections akin to those in domestic criminal trials, including private

lawyers, access to classified information, and exclusionary rules and suppression hearings.  Absent such protections, petitioners have asserted that the federal habeas statute of its own force entitles detainees to, among other things, sweeping discovery followed by <u>de novo</u> trials.  They have urged the district courts to enjoin interrogations by military intelligence officers, appoint special masters, and assume responsibility for conditions at Guantanamo Bay ranging from the speed of internet communications for habeas counsel to the delivery of mail for detainees.  One of the coordinating counsel for petitioners proudly boasted that this litigation "is brutal" for ongoing United States military operations at Guantanamo Bay.  <u>See</u> 151 Cong. Rec. S14256, S14261 (Dec. 21, 2005).

Congress responded to this unprecedented litigation crisis with the Detainee Treatment Act, which became effective on December 30, 2005.  Section 1005(e)(1) of that Act amends the federal habeas corpus statute to provide that "no court, justice, or judge shall have jurisdiction" to consider either (1) habeas petitions filed by aliens detained by the Department of Defense at Guantanamo Bay, or (2) any other action relating to any aspect of the detention of such aliens.  Section 1005(e)(2) of the Act states that this Court "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant," and it further specifies the scope and intensiveness

-4-

of that review. Section 1005(e)(1) was made immediately effective without reservation for pending cases, and Section 1005(e)(2) was made expressly applicable to pending cases.

On January 27, 2006, this Court ordered full briefing and oral argument on the effect of the Detainee Treatment Act on these cases. In prior briefing, petitioners have urged that the Act has no effect on these cases, both because it is assertedly inapplicable to any Guantanamo habeas cases pending on the date of its enactment, and because it assertedly violates the Suspension Clause of the Constitution. We address those issues in this brief. In addition, the Court instructed the parties to address the appropriate disposition of these appeals, assuming that the Act applies.

## PROVISIONS AT ISSUE

The Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006 (2005), is included as an Addendum to this brief.

## STATEMENT OF FACTS

**1.** On September 11, 2001, the United States endured the most deadly and destructive foreign attack in its history. That morning, members of the al Qaeda terrorist network hijacked four commercial airliners and crashed three of them into targets in the Nation's financial center and its seat of government. The attacks killed

almost 3,000 people, injured thousands more, destroyed billions of dollars in property, and exacted a heavy toll on the Nation's infrastructure and economy.

The President took immediate action to defend the country and prevent additional attacks, and Congress swiftly approved his use of "all necessary and appropriate force against those nations, organizations, or persons he determines planned, authorized, committed, or aided the terrorist attacks that occurred on September 11, 2001, or harbored such organizations or persons."  Authorization for Use of Military Force, Pub. L. No. 107-40, 115 Stat. 224 (Sept. 18, 2001).

The President ordered United States Armed Forces to subdue both the al Qaeda terrorist network and the Taliban regime that had harbored it in Afghanistan. Although our troops have removed the Taliban from power and dealt al Qaeda forces a heavy blow, armed combat against these enemies unfortunately remains ongoing. Many courageous Americans have been killed or wounded in combat, and many more continue to put themselves in harm's way in order to defeat al Qaeda and the Taliban, and to protect this Nation from further attacks.

During these conflicts, the United States has seized thousands of hostile fighters.  Consistent with the law and settled practice of armed conflict, it has detained a small proportion of them as enemy combatants.  Approximately 490 of

these enemy combatants are being held at the United States Naval Base at Guantanamo Bay, Cuba.  Each of them was captured abroad and is an alien.

**2.**  Each Guantanamo Bay detainee has received a formal adjudicatory hearing before a Combatant Status Review Tribunal.  Those tribunals, established pursuant to written orders under the authority of the Secretary of Defense, were created specifically "to determine, in a fact-based proceeding, whether the individuals detained * * * at the U.S. Naval Base Guantanamo Bay, Cuba, are properly classified as enemy combatants and to permit each detainee the opportunity to contest such designation."  Al Odah JA 1191.

During the CSRT proceedings, each detainee received substantial procedural protections modeled upon those provided in detention hearings under regulations implementing the Third Geneva Convention.  Among other things, each detainee received notice of the unclassified factual basis for his designation as an enemy combatant and an opportunity to testify, call witnesses, and present relevant and reasonably available evidence.  Al Odah JA 1197.  Each detainee also received assistance from a military officer designated as his "personal representative for the purpose of assisting the detainee in connection with the [CSRT] review process."  Id. at 1187.  Another military officer, the recorder of each tribunal, was required to present any evidence that might "suggest that the detainee should not be designated

as an enemy combatant." Id. at 1203.  Each tribunal consisted of three military officers sworn to render an impartial decision and in no way "involved in the apprehension, detention, interrogation, or previous determination of status of the detainees." Id. at 1194.  Each tribunal decision was subject to mandatory review first by the CSRT Legal Advisor and then the CSRT Director.  Id. at 1202.  Out of the 558 CSRT hearings conducted, 38 resulted in determinations that the detainee in question was not an enemy combatant. See CSRT Summary, http://www.defenselink.mil/news/Mar2005/d20050329csrt.pdf.

Each detainee not subject to trial before a military commission also receives an annual hearing before an Administrative Review Board (ARB).  The Secretary of Defense established these tribunals to assess whether the detainee remains a threat to the United States and its allies in the ongoing armed conflicts with the Taliban and al Qaeda.  See Administrative Review Implementation Directive, http://www.defenselink.mil/news/Sep2004/d20040914adminreview.pdf.  The ARB is selected by and reports to a "designated civilian official," who is a Presidentially-appointed and Senate-confirmed officer in the Department of Defense designated by the Secretary of Defense.  Id.

The ARBs also afford substantial procedural protections.  A designated military officer provides the Board "all reasonably available threat information" in

the possession of the Department of Defense and any other information indicating whether it would be in the interest of the United States or its allies to continue to detain or release the detainee.  Id.  The detainee receives a written unclassified summary of this information before the hearing, and may present evidence on his own behalf.  Id.  A military officer is assigned to assist the detainee.  Id.  Unless inconsistent with national security, the home government of the detainee receives notice of and may provide information at the hearing.  Id.  The Board may seek additional facts and must issue a written recommendation whether detention should be continued.  Id.  The designated civilian official makes the final detention determination.  Id.  To date, ARB proceedings have resulted in the release or transfer of 29 detainees from Guantanamo Bay.  See ARB Summary, http://www.defenselink.mil/news/Jan2006/d20060130arb.pdf;  ARB-2 Summary, http://www.defenselink.mil/news/Jan2006/d20060216arb2.pdf.

**3.**  In early 2002, a few Guantanamo detainees filed habeas corpus actions to challenge their detention as enemy combatants.  In Rasul v. Bush, 215 F. Supp. 2d 55, 65-73 (D.D.C. 2002), the district court dismissed two such actions on the ground that, under Johnson v. Eisentrager, 339 U.S. 763 (1950), neither the federal habeas statute (28 U.S.C. § 2241) nor the general federal question statute (28 U.S.C. § 1331) extends habeas corpus jurisdiction to aliens held outside the sovereign territory of the

United States.  This Court affirmed the jurisdictional dismissal.  Al Odah v. United States, 321 F.3d 1134 (D.C. Cir. 2003).  Citing Eisentrager, it agreed that "no court in this country has jurisdiction to grant habeas relief, under 28 U.S.C. § 2241, to the Guantanamo detainees."  Id. at 1141.

The Supreme Court reversed this Court on jurisdictional grounds and remanded the cases to the district court.  Rasul v. Bush, 542 U.S. 466 (2004).  The Court reasoned that, on the question of "statutory jurisdiction" under 28 U.S.C. § 2241, Eisentrager had implicitly rested on the narrow construction of the habeas statute adopted in Ahrens v. Clark, 335 U.S. 188 (1948), and was therefore implicitly overruled on that question by Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484 (1973).  See Rasul, 542 U.S. at 476-79.  The Court further reasoned that the text of the habeas statute, which was conceded to apply extraterritorially to American citizens at Guantanamo Bay, "draws no distinction between Americans and aliens." Id. at 481.  Finally, after "hold[ing] that § 2241 confers * * * jurisdiction to hear petitioners' habeas corpus challenges to the legality of their detention at the Guantanamo Bay Naval Base," the Court adopted a parallel construction of 28 U.S.C. § 1331.  Id. at 483-85.  The Court concluded its opinion by stressing that it had decided "only whether the federal courts have jurisdiction," and it expressly declined to address "the merits of petitioners' claims."  See id. at 485.

-10-

**4.** After the remand in <u>Rasul</u>, numerous other Guantanamo detainees filed their own habeas petitions.  By the end of July 2004, 13 cases involving more than 60 detainees were pending in the district court and consolidated for limited procedural purposes.  <u>Al Odah</u> JA 1239.  The Government filed motions to dismiss in each of these cases, which are the subject of the two pending appeals.

In 11 cases including <u>Al Odah</u>, Judge Green granted in part and denied in part the motions to dismiss.  <u>Al Odah</u>. JA 1228-1302.  She concluded that the Fifth Amendment applies extraterritorially to aliens held at Guantanamo Bay (<u>id.</u> at 1245-65) and that the CSRT procedures fail to satisfy the Due Process Clause of that Amendment (<u>id.</u> at 1265-95).  She identified three perceived flaws in the CSRT procedures: first, that detainees were not given private attorneys with access to classified information; second, that in some cases the CSRT might not have sufficiently considered whether evidence was the product of coercion; and third, that the definition of "enemy combatant" used by the CSRTs was potentially vague or overbroad.  <u>Ibid.</u>  Given those perceived flaws, she held that the habeas courts have an "obligation * * * to provide the petitioner with a fair opportunity to challenge the government's factual basis for his detention."  <u>Id.</u> at 1295.  She further held that the Third Geneva Convention is judicially enforceable at the behest of individual detainees and that it protects members of the Taliban but not members of al Qaeda.

Id. at 1296-97.  She dismissed various other constitutional, statutory, and treaty claims brought by the petitioners.  Id. at 1300-01.  Finally, she certified her order for an interlocutory appeal, which this Court accepted.

In two cases including Boumediene, Judge Leon granted the motions to dismiss in their entirety.  Boumediene JA 999-1032.[1]  He held that petitioners' detention is affirmatively authorized by the AUMF and consistent with the President's constitutional powers as Commander-in-Chief.  Id. at 1007-12.  He further held that the Constitution does not protect aliens outside United States sovereign territory, including aliens held at Guantanamo Bay.  Id. at 1012-19.  And he held that none of the statutes, regulations, and treaties cited by petitioners creates judicially enforceable individual rights.  Id. at 1019-26.  The Boumediene petitioners took an appeal from that final judgment.

This Court consolidated the Al Odah and Boumediene appeals for purposes of oral argument, which was held on September 8, 2005.

**5.**  During the pendency of these appeals, habeas filings have continued to accelerate.  To date, more than 200 cases have been filed, purportedly on behalf of some 600 detainees.  Although some of these filings appear duplicative, and others

---

[1]  The second case became moot when its only appellant, petitioner Ridouane Khalid, was released from Guantanamo Bay and repatriated to France.

name petitioners who cannot be matched with actual detainees, the number of detainees with pending petitions is well over 300.  The Department of Defense has been forced to reconfigure its operations at the Guantanamo Naval Base to accommodate hundreds of visits by private habeas counsel.  The detainees have urged habeas courts to dictate  conditions on the Base ranging from the speed of Internet access afforded their lawyers to the extent of mail delivered to detainees.  This habeas litigation has consumed enormous resources and disrupted the day-to-day operation of the Guantanamo Naval Base.

Perhaps most disturbing, the habeas litigation has imperiled crucial military operations during a time of war.  In some instances, habeas counsel have violated protective orders and jeopardized the security of the Base by giving detainees information likely to cause unrest.  Moreover, habeas counsel have frustrated interrogations critical to preventing further terrorist attacks on the United States.  One of the coordinating counsel for the detainees boasted about this in public: "The litigation is brutal for [the United States].  It's huge.  We have over one hundred lawyers now from big and small firms working to represent these detainees.  Every time an attorney goes down there, it makes it that much harder [for the U.S. military] to do what they're doing.  You can't run an interrogation * * * with attorneys.  What

are they going to do now that we're getting court orders to get more lawyers down there?" <u>See</u> 151 Cong. Rec. S14256, S14260 (Dec. 21, 2005).

**6.** In response to this litigation crisis, Congress enacted the Detainee Treatment Act of 2005, Pub. L. No. 109-148, §§ 1001-1006, 119 Stat. 2680, 2739-45 (2005). The President signed the Act into law on December 30, 2005. Section 1005 of the Act, the provision at issue here, divests the courts of habeas jurisdiction in cases involving the Guantanamo detainees, but gives this Court exclusive jurisdiction to review both the CSRT determinations by which the detainees are held as enemy combatants and any criminal convictions of the detainees rendered by military commissions.

Section 1005(e)(1) effects the repeal of habeas jurisdiction. It expressly amends the habeas statute, 28 U.S.C. § 2241, to state that "no court, justice, or judge shall have jurisdiction to hear or consider" two specified categories of cases, except as provided by the Act itself. The first category of cases encompasses any "application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay, Cuba." §1005(e)(1). The second category of cases encompasses "any other action against the United States or its agents relating to any aspect of the detention by the Department of Defense of an alien at Guantanamo Bay, Cuba," if the detainee is currently in military custody or

has been determined under the review procedures established by the Act to have been properly detained as an enemy combatant. Id.

Section 1005(e)(2) of the Act replaces habeas jurisdiction with an exclusive-review mechanism in this Court. It confers upon this Court "exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." § 1005(e)(2)(A). Section 1005(e)(2) also specifies the governing "scope of review," by stating that this Court may determine whether a final CSRT decision "was consistent with the standards and procedures specified by the Secretary of Defense," and "to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States." § 1005(e)(2)(C).

Section 1005(e)(3) creates an exclusive-review mechanism for Guantanamo detainees seeking to challenge criminal convictions rendered by military commissions. It confers upon this Court "exclusive jurisdiction to determine the validity of any final decision" rendered by a military commission, § 1005(e)(3)(A), and, in a correlative "scope of review" provision, it authorizes this Court to determine whether a military commission decision "was consistent with the standards and procedures specified" in the governing Executive Orders and "to the extent the

Constitution and laws of the United States are applicable, whether the use of such standards and procedures is consistent with the Constitution and laws of the United States," § 1005(e)(3)(D).

Section 1005(h), titled "effective date," contains two provisions. The first provision states that Section 1005, including its elimination of statutory habeas jurisdiction, is effective immediately. § 1005(h)(1) ("This section shall take effect on the date of the enactment of this Act."). The second provision makes this Court's exclusive jurisdiction over challenges to CSRT and military commission decisions expressly applicable to pending cases. § 1005(h)(2) ("Paragraphs (2) and (3) of subsection (e) shall apply with respect to any claim whose review is governed by one of such paragraphs and that is pending on or after the date of the enactment of this Act.").

## SUMMARY OF ARGUMENT

The Detainee Treatment Act applies to these appeals, is constitutional, and mandates conversion of the appeals into petitions for review under the Act.

**I.** The Detainee Treatment Act plainly applies to these appeals. By its terms, the Act creates an exclusive-review mechanism that permits the Guantanamo detainees to challenge their CSRT determinations in this Court. § 1005(e)(2). At the same time, the Act expressly eliminates all other sources of jurisdiction, including

habeas corpus, by which the detainees might challenge any aspect of their detention. § 1005(e)(1). The Act makes the exclusive-review scheme expressly applicable to claims pending on the date of its enactment, § 1005(h)(2), and it makes the repeal of alternative sources of jurisdiction effective immediately and without reservation for pending cases, § 1005(h)(1). In tandem, these provisions govern the pending appeals.

Exclusive-review schemes, like the one created by Section 1005(e)(2), by their very nature preclude courts from exercising jurisdiction under alternative and more general grants of jurisdiction, including habeas corpus. Moreover, the exclusive-review scheme created by Section 1005(e)(2) is expressly applicable to claims governed by the scheme and pending on the date of its enactment. That alone forecloses the exercise of habeas jurisdiction in these cases. Petitioners' contention that Section 1005(e)(2) governs only challenges to future CSRT decisions is belied by the text of the Act, which makes the exclusive-review scheme govern challenges to "any" CSRT decision "pending on" the date of its enactment.

Moreover, without reservation for pending cases, Section 1005(e)(1) of the Act expressly and immediately eliminates every other jurisdictional basis – including specifically habeas corpus – through which the Guantanamo detainees might challenge their detention. Under settled interpretive principles, such jurisdiction-ousting statutes apply to pending cases. Petitioners err in contending that Section

-17-

1005(e)(1), which addresses only the future exercise of judicial power, and which does not preclude the Guantanamo detainees from challenging their detention either under Section 1005(e)(2) or through the ARBs, would be impermissibly retroactive if given immediate effect in pending cases.

Petitioners also err in contending that the combination of Section 1005(e)(1) and Section 1005(e)(2), each of which independently precludes the continuing exercise of habeas jurisdiction in these cases, somehow accomplishes exactly the opposite. All of petitioners' arguments fail on their own terms. Moreover, their assertion that Congress intended for its exclusive-review scheme to govern only the possibly-null set of future CSRT determinations, and to be wholly inapplicable to the hundreds of pending Guantanamo habeas cases, is nonsensical given the circumstances surrounding the Act's passage.

**II.** The Act is fully consistent with the Suspension Clause of the Constitution. As aliens held outside the sovereign territory of the United States, petitioners have no constitutional rights under the Suspension Clause or otherwise. But even if they did, the elimination of habeas review would still be permissible because Section 1005(e)(2) provides an adequate substitute remedy through which petitioners can challenge their detention as enemy combatants. Decisions about the scope of habeas corpus, or any substitute, ordinarily are for Congress. Section 1005(e)(2) permits this

Court to determine not only whether the CSRT followed its own procedures, but also whether the use of such procedures is consistent with the Constitution and federal law.  Given the extensiveness of the CSRT procedures, and the historical traditions governing the detention of enemy combatants during armed conflict, that review is more than constitutionally sufficient.

**III.**   Because the Act applies to these cases, this Court can exercise no jurisdiction other than that afforded by the exclusive-review provisions of Section 1005(e)(2).  To avoid the wasteful exercise of dismissal and re-filing, the Court can and should recast the pending appeals as petitions for review under Section 1005(e)(2) – a disposition expressly anticipated by Congress.  The Court should then proceed to decide the issues raised by petitioners that fall within the scope of its review under Section 1005(e)(2), including Fifth Amendment and AUMF claims that have already been fully briefed and argued.  Finally, because neither this Court nor the district court has continuing jurisdiction over the pending habeas petitions, the Court should vacate the judgments of the district court in those cases and remand the cases with instructions to dismiss.

**ARGUMENT**

## I.    THE DETAINEE TREATMENT ACT APPLIES TO, AND RESTRICTS JURISDICTION IN, THESE PENDING CASES

It is hornbook law that jurisdiction must exist throughout the pendency of litigation.   "'Without jurisdiction the court cannot proceed at all in any cause. Jurisdiction is power to declare the law, and when it ceases to exist, the only function remaining to the Court is that of announcing the fact and dismissing the cause.'" Steel Co. v. Citizens for a Better Env't, 523 U.S. 83, 94 (1998) (quoting Ex Parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868)).  Moreover, "'[e]very federal appellate court has a special obligation to "satisfy itself not only of its own jurisdiction, but also that of the lower courts in a cause under review."'" Id. at 95 (quoting Arizonans for Official English v. Arizona, 520 U.S. 43, 73 (1997) (in turn quoting Mitchell v. Maurer, 293 U.S. 237, 244 (1934))).

The Detainee Treatment Act plainly ousts the courts of jurisdiction in these pending cases, except as provided in the Act itself.  In independent but mutually reinforcing provisions, the Act removes preexisting sources of jurisdiction in two ways: by creating an exclusive-review scheme under which the Guantanamo detainees may challenge their CSRT determinations directly in this Court; and by expressly eliminating all other sources of jurisdiction, including habeas corpus, in

cases involving the Guantanamo detainees.   The exclusive-review scheme is expressly applicable to pending cases, and the provision eliminating other sources of jurisdiction contains no reservation for pending cases.   Together these provisions require dismissal to the extent that the pending appeals rest on 28 U.S.C. §§ 1291 and 1292(b), and they preclude any continuing exercise of district court jurisdiction in these cases.

### A.    This Act Gives This Court "Exclusive" Jurisdiction Over Claims By The Guantanamo Detainees "Pending On" The Date Of Its Enactment

**1.**  By its terms, Section 1005(e)(2) of the Detainee Treatment Act states that this Court "shall have exclusive jurisdiction to determine the validity of any final decision of a Combatant Status Review Tribunal that an alien is properly detained as an enemy combatant." § 1005(e)(2)(A).  That "exclusive" jurisdiction plainly covers the habeas actions giving rise to these appeals: in contending that their detention is unlawful, petitioners necessarily challenge the "validity" of the CSRT decisions that each of them "is properly detained as an enemy combatant."   Moreover, the Act makes this "exclusive" jurisdiction expressly applicable to pending cases:  Section 1005(h)(2) states that Section 1005(e)(2) "shall apply with respect to any claim whose review is governed by" Section 1005(e)(2) "and that is pending on or after the date of the enactment of this Act."  By its very nature, this scheme of "exclusive" review

precludes resort to other grants of jurisdiction such as the habeas statute or the general federal question statute.

Exclusivity is particularly appropriate given the precise and reticulated nature of Section 1005(e)(2), which is specific to Guantanamo detainees held as enemy combatants pursuant to CSRT decisions, and which contains its own detailed limitations provisions and standards of review. It is well-settled that such an exclusive-review scheme, where applicable, precludes the exercise of jurisdiction under more general grants of jurisdiction, including habeas corpus. See, e.g., 5 U.S.C. § 703 ("form of proceeding for judicial review is the special statutory review proceeding relevant to the subject matter in a court specified by statute or, in the absence or inadequacy thereof, any applicable form of legal action, including actions for * * * writs of * * * habeas corpus"); Thunder Basin Coal Co. v. Reich, 510 U.S. 200, 207-09 (1994) ("exclusive" jurisdiction under federal Mine Act precludes assertion of district court jurisdiction); FCC v. ITT World Communications, Inc., 466 U.S. 463, 468 (1984) (Hobbs Act) ("The appropriate procedure for obtaining judicial review of the agency's disposition of these issues was appeal to the Court of Appeals as provided by statute."); Laing v. Ashcroft, 370 F.3d 994, 999-1000 (9th Cir. 2004) ("§ 2241 is ordinarily reserved for instances in which no other judicial remedy is available"); Lopez v. Heinauer, 332 F.3d 507, 511 (8th Cir. 2003) ("Because judicial

review was available * * * the district court was not authorized to hear this § 2241 habeas petition."). Indeed, the same principles apply even if Congress does not explicitly state that the more specific review mechanism is exclusive. See, e.g., United States v. Erika, Inc., 456 U.S. 201, 205-08 (1982) (Medicare review scheme precludes exercise of Tucker Act jurisdiction); Telecommunications Research & Action Ctr. v. FCC, 750 F.2d 70, 77 (D.C. Cir. 1984) ("even where Congress has not expressly stated that statutory jurisdiction is 'exclusive' * * *, a statute which vests jurisdiction in a particular court cuts off original jurisdiction in other courts in all cases covered by that statute") (footnote omitted).

**2.** In prior briefing, petitioners have urged that Section 1005(e)(2) governs review only of CSRT decisions rendered after, rather than before, the date of its enactment. Petitioners note that, although Section 1005(e)(2) encompasses review of "any final decision of a Combatant Status Review Tribunal," § 1005(e)(2)(A), it is qualified by a limitations provision restricting that jurisdiction, in pertinent part, to aliens "for whom a Combatant Status Review Tribunal has been conducted, pursuant to applicable procedures specified by the Secretary of Defense," § 1005(e)(2)(B)(ii). Petitioners further note that the Act requires the Secretary to submit the governing CSRT and ARB procedures to Congress not later than 180 days after its enactment, § 1005(a)(1)(A), and that it specifies particular protections for the

-23-

submitted procedures, §§ 1005(a)(2), 1005(a)(3), 1005(b).  From all of this, petitioners conclude that Section 1005(e)(2) applies only to those future CSRT decisions that afford the new statutory protections.

Petitioners' argument is wholly unconvincing.  To begin with, it is inconsistent with Section 1005(h)(2), which makes this Court's exclusive jurisdiction to review challenges to CSRT decisions expressly applicable to "any claim * * * that is pending on or after the date of the enactment of this Act."  That language extends Section 1005(e)(2) not only to future challenges to future CSRT decisions, but also to present challenges to past CSRT decisions "pending on" the date of enactment.  Petitioners' contrary construction, which would limit the Act to review of future CSRT decisions, would improperly deprive the "pending on" language of any meaningful effect.  See Beck v. Prupis, 529 U.S. 494, 506 (2000) ("a statute should not be construed so as to render any provision of that statute meaningless or superfluous").  This understanding is reinforced by the temporal-scope provision in Section 1005(b), which imposes a specific requirement for the procedures submitted to Congress (§ 1005(b)(1)), but states that the requirement only "applies with respect to any proceeding beginning on or after the date of the enactment of this Act" (§ 1005(b)(2)).  Petitioners' reading of the Act would collapse Congress's careful temporal distinction between Section 1005(b), which applies to CSRT proceedings "beginning on or after" the date of

-24-

enactment, and Section 1005(e)(2), which applies to CSRT challenges "pending on or after" the date of enactment.

The textual provisions cited by petitioners do not support their reasoning. First, it is implausible that Congress would give this Court exclusive jurisdiction to review "any final decision of a Combatant Status Review Tribunal" (§ 1005(e)(2)(A)) – a formulation that plainly encompasses the 558 past CSRT decisions – only to eliminate that jurisdiction in its entirety, in a subordinate clause in a subsequent limitations provision, by elliptical reference to CSRTs "pursuant to applicable procedures specified by the Secretary of Defense" (§ 1005(e)(2)(B)(ii)).  As the Supreme Court repeatedly has instructed, Congress "'does not, one might say, hide elephants in mouseholes.'" Gonzales v. Oregon, 126 S. Ct. 904, 921 (2006) (quoting Whitman v. American Trucking Ass'ns, 531 U.S. 457, 468 (2001)).  In any event, petitioners are simply wrong to the extent they suggest that past CSRTs were not conducted under "procedures specified by the Secretary of Defense."  To be sure, the initial order establishing the CSRTs was signed by the Deputy Secretary of Defense. See Al Odah JA 1187-90.  But Congress has authorized the Secretary of Defense to "exercise any of his powers through" designated subordinates, see 10 U.S.C. § 113(d), and the Secretary has delegated to the Deputy Secretary the "full power and authority to act for the Secretary of Defense and to exercise the powers of the

Secretary of Defense upon any and all matters concerning which the Secretary of Defense is authorized to act pursuant to law," see 32 C.F.R. § 341.1 (2002); accord Department of Defense Directive 5105.02 (2006).  Moreover, in a subsequent memorandum implementing the CSRT order, the Secretary of the Navy confirmed that "the Secretary of Defense has established a Combatant Status Review Tribunal (CSRT) process."  Al Odah JA 1191.

Petitioners fare no better in invoking the Act's reporting provisions.  The Act requires the Secretary to submit to Congress a report setting forth the "procedures of the Combatant Status Review Tribunals and the Administrative Review Boards established by direction of the Secretary of Defense that are in operation at Guantanamo Bay." § 1005(a)(1)(A).  To the extent it is relevant at all, that provision suggests that the Act uses the term "Combatant Status Review Tribunals" in its ordinary sense, to encompass not only whatever CSRTs may be conducted in the future, but also the hundreds of CSRTs actually conducted in the past.

Finally, the three protections mandated by the Act, which require only small adjustments to the existing CSRT and ARB procedures, cannot bear the weight that petitioners would place on them.  First, the Act requires future CSRT and ARB decisions to be reviewed by a "designated civilian official" appointed by the President and confirmed by the Senate. § 1005(a)(2).  Petitioners' CSRT decisions were

reviewed by a CSRT Director (Al Odah JA 1202), who was a Presidentially-appointed and Senate-confirmed military officer with the rank of Rear Admiral (id. at 1212).  Moreover, their future annual ARBs will be reviewed by a "designated civilian official" pursuant to the Act, just as they would have been under existing ARB procedures, see Administrative Review Implementation Directive, http://www.defenselink.mil/news/Sep2004/d20040914adminreview.pdf. Second, the Act requires "periodic review of any new evidence that may become available relating to the enemy combatant status of a detainee." § 1005(a)(3).  Existing ARB procedures afford analogous review.  See Administrative Review Implementation Directive, supra.  Third, in a provision made explicitly prospective, the Act requires future CSRTs and ARBs, "to the extent practicable," to assess whether any statement about a detainee "was obtained as a result of coercion" and, if so, "the probative value (if any) of any such statement."  § 1005(b).  Petitioners' CSRTs were permitted to consider statements about the detainee, but only after "taking into account the reliability of such evidence in the circumstances" presented.  Al Odah JA 1189, 1199. Petitioners' suggestion that Congress would have created an elaborate exclusive-review scheme to govern challenges to any future CSRTs, but exempted from that scheme challenges to any of the 558 completed CSRTs, based on differences as small as these, is absurd given the circumstances surrounding enactment of the Act.

-27-

Petitioners' view – that they can maintain their pending habeas actions <u>and</u> bring new challenges to any future CSRTs under Section 1005(e)(2) – would drastically increase the burden on the Department of Defense and the courts, in contravention of the Act's language and clear purpose.

By its terms, the Act gives this Court "exclusive" jurisdiction to review "any final decision of a Combatant Status Review Tribunal," § 1005(e)(2)(A), including past CSRT decisions giving rise to claims "pending on * * * the date of [its] enactment," § 1005(h)(2). Petitioners' cases fall squarely within these provisions. On this ground alone, the Act bars the exercise of any other jurisdiction.

### B.    The Act Eliminates Habeas Jurisdiction Without Any Reservation For Pending Cases

**1.**  The Detainee Treatment Act bars the exercise of other jurisdiction in these cases in a second, independent way as well. Section 1005(e)(1) amends the habeas statute to state that, except as provided for in the Act itself, "no court, justice, or judge shall have jurisdiction to hear or consider" either (1) "an application for a writ of habeas corpus filed by or on behalf of an alien detained by the Department of Defense at Guantanamo Bay," or (2) "any other action against the United States or its agents relating to any aspect of the detention" of such an alien, if, in pertinent part, the alien "is currently in military custody." This provision obviously overcomes whatever

interpretive presumption might exist against repeal of the habeas statute. <u>See</u> <u>INS</u> v. <u>St. Cyr</u>, 533 U.S. 289, 298 (2001) (requiring "a clear statement of congressional intent to repeal habeas jurisdiction"). It plainly covers the habeas claims of petitioners, who are "alien[s] detained by the Department of Defense at Guantanamo Bay." It also covers any non-habeas claims petitioners might raise about "any aspect of [their] detention," including challenges to conditions of confinement, because petitioners are "currently in military custody." Finally, Section 1005(e)(1) takes effect immediately, <u>see</u> § 1005(h)(1) ("This section shall take effect on the date of the enactment of this Act."), and makes no reservation for pending cases.

In <u>Landgraf</u> v. <u>USI Film Products</u>, 511 U.S. 244 (1994), the Supreme Court explained at length the interpretive presumptions governing the temporal scope of federal statutes. <u>Landgraf</u> held that, to avoid concerns about unfair retroactivity, statutes governing primary conduct are presumptively inapplicable to cases pending on the date of enactment. <u>See</u> <u>id.</u> at 265-73. At the same time, however, <u>Landgraf</u> stressed that a different rule has always governed statutes addressing the jurisdiction of the courts: "We have regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed." <u>Id.</u> at 274. "Present law normally governs in such situations because jurisdictional statutes 'speak to the power of the court rather than to the

-29-

rights or obligations of the parties.'" Id. at 274 (quoting Republic National Bank of Miami v. United States, 506 U.S. 80, 100 (1992) (Thomas, J., concurring)).  In other words, the application of intervening jurisdictional statutes to pending cases is not retroactive at all.  See id. at 293 (Scalia, J., concurring in the judgment) ("applying a jurisdiction-eliminating statute to undo past judicial action would be applying it retroactively; but applying it to prevent any judicial action after the statute takes effect is applying it prospectively").

Consistent with these principles, the Supreme Court in Bruner v. United States, 343 U.S. 112 (1952), stated, as a "rule * * * adhered to consistently," that "when a law conferring jurisdiction is repealed without any reservation as to pending cases, all cases fall with the law." Id. at 116-117 & n.8.  And that rule applies no matter how far pending litigation has progressed.  In Bruner itself, a statute eliminating district court jurisdiction over certain claims was enacted only after the Supreme Court had granted certiorari in the case, yet the Court held that the case must be dismissed for lack of jurisdiction.  See id. at 114, 117.  The Court explained that, "[a]bsent such a reservation [as to pending cases]," the district court lacked jurisdiction, "even though [the court] had jurisdiction * * * when petitioner's action was brought." Id. at 115.

Earlier decisions are to the same effect.  See, e.g., Gallardo v. Santini Fertilizer Co., 275 U.S. 62, 63 (1927) (Holmes, J.) (ordering dismissal because, after the district court had issued an injunction, Congress passed a law "that took away the jurisdiction of the District Court in this class of cases"); Hallowell v. Commons, 239 U.S. 506, 508-509 (1916) (Holmes, J.) (affirming dismissal because, while the action was pending, Congress enacted a jurisdiction-ousting provision that "made no exception for pending litigation"); Sherman v. Grinnell, 123 U.S. 679, 680 (1887) ("'if a law conferring jurisdiction is repealed without a reservation as to pending cases, all such cases fall with the law'") (quoting Railroad Co. v. Grant, 98 U.S. (8 Otto) 398, 401 (1878)); Assessors v. Osbornes, 76 U.S. (9 Wall.) 567, 575 (1869) ("inasmuch as the repealing act contained no saving clause, all pending actions fell, as the jurisdiction depended entirely upon the act of Congress"); Ex parte McCardle, 74 U.S. (7 Wall.) 506, 514 (1868) ("no judgment could be rendered in a suit after the repeal of the act under which it was brought and prosecuted").

Recent decisions continue to follow these settled rules.  Two terms ago, in Republic of Austria v. Altmann, 541 U.S. 677 (2004), the Supreme Court once again reaffirmed "the application to all pending and future cases of 'intervening' statutes that merely 'confe[r] or ous[t] jurisdiction.'" Id. at 693 (quoting Landgraf, 511 U.S. at 274).  This Court did the same in LaFontant v. INS, 135 F.3d 158 (D.C. Cir. 1998),

in quoting <u>Landgraf</u> for the proposition that the Court has "'regularly applied intervening statutes conferring or ousting jurisdiction, whether or not jurisdiction lay when the underlying conduct occurred or when the suit was filed.'" <u>Id.</u> at 161 (quoting 511 U.S. at 274). And in <u>Santos</u> v. <u>Territory of Guam</u>, __ F.3d __, 2006 WL 118375 (9th Cir. Jan. 3, 2006), the Ninth Circuit recently applied <u>Bruner</u> to give immediate effect to a jurisdiction-ousting provision, enacted after oral argument in the case, even though Congress had acted "without expressing an intent as to the effective date of its new statute." <u>Id.</u> at *2; <u>see also id.</u> at *4 (Wallace, J., concurring) ("Because there was no 'reservation as to pending cases' in the statute at issue here, we lack jurisdiction over the present appeal.") (quoting <u>Bruner</u>, 343 U.S. at 116).

**2.** In seeking to avoid this settled precedent, petitioners contend that Section 1005(e)(1) must be treated as substantive rather than jurisdictional for purposes of retroactivity analysis. Petitioners cite <u>Hughes Aircraft Co.</u> v. <u>United States ex rel. Schumer</u>, 520 U.S. 939 (1997), which declined to give immediate effect to False Claims Act amendments eliminating a defense to liability and creating a new cause of action. Although the amendments were phrased in jurisdictional terms, the Court declined to apply them to pending cases. It explained that statutes "merely addressing <u>which</u> court shall have jurisdiction to entertain a particular cause of action can fairly be said merely to regulate the secondary conduct of the litigation and not the

underlying primary conduct of the parties" – and thus are presumptively applicable to cases pending on the date of enactment. <u>See</u> <u>id.</u> at 951. In contrast, statutes addressing "<u>whether</u> [a suit] may be brought at all" are "substantive" ones presumptively inapplicable to such pending cases. <u>See</u> <u>ibid.</u>

For several reasons, <u>Hughes</u> does not help petitioners. Most obviously, the withdrawal of habeas jurisdiction effected by Section 1005(e)(1) does not deprive petitioners of the ability to obtain review of their detention as enemy combatants. In its entirety, the Act plainly address the "which court" question, not the "whether" question, by replacing district court jurisdiction with exclusive jurisdiction in this Court. Moreover, the rule that jurisdiction-ousting provisions are presumptively applicable to pending cases has never depended on the availability of an alternative <u>judicial</u> forum. In <u>Hallowell</u>, the Supreme Court gave immediate effect, in a case pending on the date of enactment, to a statute that divested the district courts of jurisdiction to review certain administrative determinations made by the Secretary of the Interior. <u>See</u> 239 U.S. at 507-08. Speaking unanimously through Justice Holmes, the Court concluded that the statute "takes away no substantive right," but, by making "final and conclusive" an <u>Executive</u> Branch determination, "simply changes the tribunal that is to hear the case." <u>Id</u>. at 508. This Court applied exactly that reasoning in <u>LaFontant</u>, which gave immediate effect to a statute foreclosing any judicial review

-33-

of certain deportation orders. <u>See</u> 135 F.3d at 164-65. This Court treated the statute as jurisdictional for purposes of retroactivity analysis. Applying <u>Hallowell</u>, and distinguishing <u>Hughes</u>, the Court held that a "jurisdictional change from an Article III court to an administrative decision maker is simply a change in the 'tribunal that is to hear the case.'" <u>Id.</u> at 162 (quoting <u>Kolster</u> v. <u>INS</u>, 101 F.3d 785, 788 (1st Cir. 1996)). Accordingly, even if Section 1005(e)(2) were erroneously ignored, Section 1005(e)(1) still would be jurisdictional for retroactivity purposes, because its application would simply change the tribunal authorized to hear detention challenges from a judicial one (the habeas court) to an administrative one (the CSRT and ARB).

Furthermore, whatever default rules of construction might apply in other contexts, the courts have not hesitated to give immediate effect to provisions bearing on critical matters of war and foreign relations. For example, in <u>United States</u> v. <u>The Schooner Peggy</u>, 5 U.S. (1 Cranch) 103 (1801), the Supreme Court gave immediate effect to a treaty addressed to wartime captures and enacted after the court of appeals had rendered its judgment. Although the treaty concededly affected substantive rights, the Court declined to frustrate war objectives by imposing a retroactivity-based clear statement rule. Speaking unanimously through Chief Justice Marshall, the Court explained: "in mere private cases between individuals, a court will and ought to struggle hard against a construction which will, by a retrospective operation, affect

-34-

the rights of parties, but in great national concerns where individual rights, acquired by war, are sacrificed for national purposes, the contract, making the sacrifice, ought always to receive a construction conforming to its manifest import; and if the nation has given up the vested rights of its citizens, it is not for the court, but for the government, to consider whether it be a case proper for compensation." Id. at 110. Similarly, in Acree v. Iraq, 370 F.3d 41 (D.C. Cir. 2004), Chief Justice (then Judge) Roberts, in addressing a point not reached by the panel majority, would have given immediate effect to a statute restoring the foreign sovereign immunity of Iraq with respect to claims by American servicemembers arising out of war crimes committed by the predecessor Iraqi regime. See id. at 64-65 (opinion concurring in the judgment). The statute restoring Iraq's foreign sovereign immunity would have left the servicemembers with neither a judicial nor an administrative tribunal in which to press their claims, but only with the possibility of future espousal of their claims by the Executive Branch. See id. Nonetheless, Judge Roberts would have applied the statute to the pending claims, based in part on his characterization of the statute as "jurisdictional" under LaFontant and in part on the heightened need for immediate Executive Branch action in the context of warmaking and foreign policy. See ibid. If such considerations can govern the retroactivity analysis of "vested rights" of American citizens (Schooner Peggy, 5 U.S. (1 Cranch) at 110), and of wartime claims

-35-

by American citizens against a former adversary, then surely they can also govern the retroactivity analysis of a statute addressed to the litigation of wartime claims against this country by aliens held as enemy combatants.

Finally, to the extent the Act arguably has substantive effects, they arise not from the substitution of one review mechanism for another, but from the scope-of-review provision in Section 1005(e)(2), which Congress made expressly applicable to covered claims "pending on or after the date of the enactment" of the Act. § 1005(h)(2). Regardless of the governing default presumption, that kind of clear language compels application of the Act to pending cases in any event. See Landgraf, 511 U.S. at 280 ("When a case implicates a federal statute enacted after the events in suit, the court's first task is to determine whether Congress has expressly prescribed the statute's proper reach. If Congress has done so, of course, there is no need to resort to judicial default rules."). Considered individually or together, Section 1005(e)(1), which eliminates habeas jurisdiction without reservation for pending cases, and Section 1005(e)(2), which provides an alternative and exclusive review mechanism that is expressly applicable to pending cases, foreclose the exercise of all other sources of jurisdiction in these cases.

### C.    Petitioners' Other Arguments For Continuing Habeas Jurisdiction Lack Merit

As we have shown, Section 1005(e)(1) and Section 1005(e)(2) each independently forecloses the continuing exercise of habeas and other district court jurisdiction here. Petitioners err in contending that these provisions, construed together, somehow preserve that jurisdiction.

**1.**  Petitioners focus primarily on the contrast in the two "effective date" provisions in Section 1005(h). As noted above, one of them states that the schemes for exclusive review of CSRT and military commission decisions in this Court "shall apply with respect to any claim whose review is * * * pending on or after the date of the enactment of this Act," § 1005(h)(2), while the other states only that the repeal of habeas and other jurisdiction (among other provisions) "shall take effect on the date of the enactment," § 1005(h)(1). From this, petitioners conclude that the repeal of habeas jurisdiction does not apply to cases pending on the date of enactment.

Petitioners' argument fails in several respects. For the reasons explained above, it ignores that the exclusive-review provisions in Section 1005(e)(2), which expressly apply to pending cases, are themselves sufficient to preclude resort to habeas jurisdiction, and it ignores the background rule that a jurisdiction-ousting statute, such as Section 1005(e)(1), applies to pending cases absent any express

reservation for pending cases. Congress thus had no reason to state explicitly that

Section 1005(e)(1) applies to pending cases, given this "predictable background rule

against which to legislate." See Landgraf, 511 U.S. at 273. In contrast, Congress had

very good reason to specify the temporal scope of Section 1005(e)(2) and Section

1005(e)(3). Those provisions create jurisdiction and specify the governing scope of

review. For that reason, their proper characterization for retroactivity purposes, much

like the proper characterization of burdens of proof, is far less obvious than is the

proper characterization of Section 1005(e)(1), which does nothing besides oust

jurisdiction. See, e.g., Lindh v. Murphy, 521 U.S. 320, 327 (1997) (while statute

"chang[ing] standards of proof and persuasion" in the State's favor "might not have

a true retroactive effect, neither [is] it clearly 'procedural'"); Landgraf, 511 U.S. at

268 ("deciding when a statute operates 'retroactively' is not always a simple or

mechanical task"). The contrast between Section 1005(h)(1) and Section 1005(h)(2)

thus cannot support any reasonable inference that Section 1005(e)(1) is inapplicable

to pending cases (despite the default presumption to the contrary) and that Section

1005(e)(2) is inapplicable to pending cases (despite an express statement that it is).

    **2.** For similar reasons, petitioners cannot claim support from Lindh. That case

involved construction of the habeas provisions in the Antiterrorism and Effective

Death Penalty Act of 1996 (AEDPA), which amended Chapter 153 of Title 28 and

created a new Chapter 154.  Although the provisions governing both chapters address "standards affecting entitlement to relief," AEDPA made Chapter 154 expressly applicable to petitions pending on the date of its enactment, but contained no parallel provision for its amendments to Chapter 153.  <u>See</u> 521 U.S. at 329.  Relying on a negative implication, the Court held Chapter 153 inapplicable to pending petitions because, in its view, "[n]othing * * * but a different intent explains the different treatment" of otherwise parallel provisions.  <u>Ibid.</u>

        "The same negative inference does not arise," <u>Martin</u> v. <u>Hadix</u>, 527 U.S. 343, 356 (1999), where the provisions at issue lack the parallelism that was dispositive in <u>Lindh</u>.  In <u>Hadix</u>, the Court rejected application of the <u>Lindh</u> inference because the two provisions at issue addressed different subject matter and served different purposes.  <u>See id.</u> at 356-57.  So too here: The relevant provisions of the Act are not sufficiently similar to support any "negative inference," because Section 1005(e)(1) simply withdraws jurisdiction, whereas Section 1005(e)(2) creates jurisdiction <u>and</u> attaches a "limitation on claims," § 1005(e)(2)(B), <u>and</u> specifies a governing "scope of review," § 1005(e)(2)(C).  In that respect, Section 1005(e)(2) and Section 1005(e)(3) are identical.  <u>See</u> § 1005(e)(3)(C) ("limitation on appeals"); § 1005(e)(3)(D) ("scope of review").  Section 1005(e)(2) and Section 1005(e)(3) thus might well have been seen as addressing substantive issues, as <u>Lindh</u> itself suggests.

-39-

See 521 U.S. at 327. In contrast, courts post-Lindh have consistently continued to apply the rule that jurisdiction-ousting provisions are presumptively applicable to pending cases. See, e.g., Altmann, 541 U.S. at 692-93; Santos, 2006 WL 118375 at *2; LaFontant, 135 F.3d at 162-63 (distinguishing Lindh). Because Congress could readily have been more concerned about affirmatively ensuring the immediate applicability of Section 1005(e)(2) and of Section 1005(e)(3) than that of Section 1005(e)(1), the Lindh inference by its own terms inapposite.

Finally, given the subject matter of the provisions at issue here, the Lindh inference is simply nonsensical. Petitioners effectively contend that Congress, in making an exclusive-review scheme expressly applicable to pending cases, somehow manifested an intent to preserve habeas jurisdiction over the same class of cases. To state that proposition is to refute it.

**3.** Finally, petitioners rely heavily on legislative history in general, and a drafting change to Section 1005 in particular. As originally drafted, the bill that became Section 1005 stated that the "amendment made" to the habeas statute "shall apply to any application or other action that is pending on or after the date of the enactment of this Act." See 151 Cong. Rec. S12652, S12655 (Nov. 10, 2005). Petitioners contend that Congress, in replacing that provision with one stating that the

-40-

habeas amendment "shall take effect on the date of * * * enactment" (§ 1005(h)(1)) must have intended to preserve habeas jurisdiction in pending cases.

Petitioners' argument is untenable. To begin with, it is flatly inconsistent with Congress's continuing resolve – throughout the drafting process – to make the Act's exclusive-review provisions expressly applicable to pending cases. See § 1005(h)(2); 151 Cong. Rec. at S12655. It is also inconsistent with the views of Senators Graham and Kyl, the original co-sponsors of Section 1005, who have repeatedly and emphatically indicated that it applies to pending cases. See, e.g., 152 Cong. Rec. S970, S970-973 (Feb. 9, 2006) (Sen. Kyl); 151 Cong. Rec. S14256, S14260-14268 (Dec. 21, 2005) (Sens. Graham & Kyl); 151 Cong. Rec. S12752, S12754-12755 (Nov. 14, 2005) (Sen. Graham). The views of those Senators, as the original and principal sponsors of Section 1005, are particularly significant. See North Haven Bd. Of Educ. v. Bell, 456 U.S. 512, 526-27 (1982); FEA v. Algonquin SNG, Inc., 426 U.S. 548, 564 (1976). Petitioners' account is likewise inconsistent with the views of the President who signed the Act into law. See Signing Statement, 2005 WL 3562509, at *2 (Dec. 30, 2005). And it is even inconsistent with the views originally expressed by Senator Levin, the Minority co-sponsor of Section 1005, at a critical moment in the drafting history. On November 14, 2005, when the amendments to what became Section 1005 were presented to the Senate, and when Senator Levin

joined Senator Graham and Senator Kyl to give the bill bi-partisan sponsorship, Senator Levin articulated precisely the position that we urge here: "what our amendment does, as soon as it is enacted and the enactment is effective, it provides that the standards we set forth in our amendment will be the substantive standards which we would expect would be applied in all cases, including cases which are pending as of the effective date of this amendment."  151 Cong. Rec. at S12755.

Under these circumstances, the drafting amendment cannot possibly have effected the dramatic consequences attributed to it by petitioners.  For one thing, had the amendment eliminated any congressional response to the ongoing litigation crisis at Guantanamo Bay, its continuing support by the 49 Senators who had just voted to eliminate habeas jurisdiction in pending cases, see 151 Cong. Rec. at S12655 (Nov. 10, 2005), would be inexplicable.  As the Supreme Court has explained in other contexts, "'common sense suggests, by analogy to Sir Arthur Conan Doyle's "dog that didn't bark," that an amendment having the effect petitioner ascribes to it would have been differently described by the sponsor, and not nearly as readily accepted by the floor manager of the bill.'"  Koon's Buick Pontiac GMC, Inc. v. Nigh, 543 U.S. 50, 63 (2004) (quoting Church of Scientology of Cal. v. IRS, 484 U.S. 9, 17-18 (1987)).  On the other hand, the substantial increase in support for the bill as amended can be explained by another change effected by the amendments: the inclusion, for

the first time, of provisions permitting judicial review of any final convictions rendered by military commissions.  Compare § 1005(e)(3) with 151 Cong. Rec. at S12655.  Moreover, as the legislative history indicates, the specific amendment highlighted by petitioners was intended only to improve overall statutory clarity and to foreclose arguable internal inconsistency.  See, e.g., 151 Cong. Rec. at S14263 (Sen. Graham); 152 Cong. Rec. S970, S973 (Feb. 9, 2006) (Sen. Kyl).  In amendments to bills or statutes, Congress often intends such modest objectives as these.  See, e.g., Hammontree v. NLRB, 925 F.2d 1486, 1492 (D.C. Cir. 1991) ("An equally plausible reading of Congress's deletion of the proposed language, however, is that Congress deemed it superfluous"); Nichols v. Board of Trustees of Asbestos Local 24 Pension Plan, 835 F.2d 881, 896 n.105 (D.C. Cir. 1987) (amendment "might as easily have stemmed from a congressional intent to eliminate a redundant * * * requirement").

Petitioners also overstate the significance of the specific statements in the legislative history assertedly cutting in their favor.  Many of those statements (from Senators Leahy, Kennedy, and Durbin, among others) were from Senators who voted against the bill.  Of course, courts do "not usually accord much weight to the statements of a bill's opponents." Shell Oil Co. v. Iowa Dep't of Revenue, 488 U.S. 19, 29 (1988).  Petitioners also cite many statements by Senator Levin, who reversed

his initial position on the applicability of the Act to pending cases.  Compare 151 Cong. Rec. at S12755 ("the standards we set forth in our amendment will be the substantive standards which we would expect would be applied in * * * cases which are pending as of the effective date of this amendment") with 151 Cong. Rec. S14256, S14257 (Dec. 21, 2005) (Act does not "apply to or alter any habeas case pending in the courts at the time of enactment").  These statements simply establish inconsistency in the views of one Senator, which cannot possibly overcome the text of the Act, the governing interpretive presumptions, and the consistent views of its two principal sponsors and of the President.  Like the plaintiffs in Landgraf, petitioners at most identify "frankly partisan statements" that "cannot plausibly be read as reflecting any general agreement."  See 511 U.S. at 262-63.  Under these circumstances, text and interpretive presumptions are dispositive in determining how the Act applies to pending cases.  See id.

Finally, apart from its narrower flaws, petitioners' account wholly ignores the broader context in which the Act was enacted.  As explained above, the Act was plainly a response to Rasul and the litigation onslaught that followed in the wake of that decision.  Congress designed a specialized system of exclusive review under specified standards, to reflect its own balancing of the detainees' interest in obtaining some form of judicial review and the military's surpassingly important interest in

-44-

being able to successfully prosecute an ongoing war. In this context, to impute to Congress an intent to limit the specialized-review scheme only to the presently-null set of detainees who might someday be brought to Guantanamo Bay and held pursuant to future CSRT decisions, and to make the new scheme wholly inapplicable to the hundreds of pending habeas actions that gave rise to the statute in the first place, would be nonsensical. That result cannot remotely be squared with the expressed intent of Congress to have this Court's exclusive jurisdiction apply to all pending cases, and to effect an immediate repeal of habeas jurisdiction without reservation for pending cases.

## II.    THE ACT DOES NOT VIOLATE THE SUSPENSION CLAUSE

Petitioners' Suspension Clause challenge to the Act is meritless, both because petitioners have no constitutional rights and because the Act would readily satisfy any possible constitutional entitlement to habeas.

**A.** As aliens outside the sovereign territory of the United States, petitioners have no constitutional rights under the Suspension Clause. In our merits briefs, we showed that the Fifth Amendment is inapplicable to aliens outside the sovereign territory of the United States. The same is true for other constitutional provisions, as many courts have recognized. See, e.g., United States v. Verdugo-Urquidez, 494 U.S. 259 (1990) (Fourth Amendment inapplicable to searches of alien property abroad);

-45-

Cuban Am. Bar Ass'n. v. Christopher, 43 F.3d 1412, 1428 (11th Cir. 1995) (First Amendment inapplicable to aliens at Guantanamo Bay); 32 County Sovereignty Comm. v. Dep't of State, 292 F.3d 797, 799 (D.C. Cir. 2002) (a "'foreign entity without property or presence in this country has no constitutional rights, under the due process clause or otherwise'") (emphasis added) (quoting People's Mojahedin Org. of Iran v. Department of State, 182 F.3d 17, 22 (D.C. Cir. 1999)).

In Johnson v. Eisentrager, 339 U.S. 763 (1950), the Supreme Court held the Suspension Clause does not give aliens outside the United States a constitutional right to habeas corpus, at least during times of armed conflict. The Court explained emphatically that such a constitutional entitlement

> would hamper the war effort and bring aid and comfort to the enemy. [Habeas proceedings] would diminish the prestige of our commanders, not only with enemies but with wavering neutrals. It would be difficult to devise a more effective fettering of a field commander than to allow the very enemies he is ordered to reduce to submission to call him to account in his own civil courts and divert his efforts and attention from the military offensive abroad to the legal defensive at home.

Id. at 779. The Court further held that the Fifth Amendment is inapplicable to aliens abroad and, in reasoning fully applicable to the Suspension Clause, explained that "extraterritorial application of organic law" to aliens would be inconceivable. See id. at 784-85 ("No decision of this Court supports such a view. None of the learned

commentators on our Constitution has ever hinted at it.  The practice of every modern government is opposed to it." (citation omitted)).

Rasul does not change this constitutional holding.  That decision extended the federal habeas statute to the Guantanamo detainees.  The Court based its analysis on the phrase "within their respective jurisdiction" as used in 28 U.S.C. § 2241 and various decisions construing that provision.  See 542 U.S. at 476-79.  Moreover, the Court expressly distinguished between the statutory and Suspension Clause holdings of Eisentrager, and limited its analysis to the former.  See id. at 475-76.

**B.**    The Supreme Court has never decided whether the meaning of the Suspension Clause was fixed in 1789, or whether the Clause might evolve consistent with the expansion of statutory habeas over the course of American history.  See INS v. St. Cyr, 533 U.S. 289, 304-05 (2001) (reserving the question).  In our judgment, the better view is that the meaning of the Clause was fixed in 1789, because it is "too absurd to be contemplated" that the Clause would operate as a "one-way rachet that enshrines in the Constitution every grant of habeas jurisdiction" conferred by statute or judge-made common law, see id. at 341-42 (Scalia, J., dissenting), and because there are no apparent judicially manageable standards for determining how much the Suspension Clause might evolve between the historical standard of 1789 and contemporaneous statutory standards.  There is significant, albeit not controlling,

-47-

support for the historical view.  See ibid.; Swain v. Pressley, 430 U.S. 372, 384-85

(1977) (Burger, C.J., concurring in part and concurring in the judgment); Friendly,

Is Innocence Irrelevant?  Collateral Attack on Criminal Judgments, 47 U. Chi. L. Rev.

142, 170 (1970).

    In any event, petitioners cannot succeed under any plausible temporal baseline

for Suspension Clause analysis.  On this point, Rasul is fatal to them.  In Rasul, the

Justices agreed that the habeas statute, as construed in Eisentrager, would not have

extended to aliens outside the sovereign territory of the United States.  According to

the Rasul majority, the "statutory predicate" of Eisentrager was not overruled until

1973, when Braden v. 30th Judicial Circuit Court of Kentucky, 410 U.S. 484,

assertedly overruled Ahrens v. Clark, 335 U.S. 188 (1948).  See Rasul 542 U.S. 476-

79.  According to the Rasul dissent, the statutory holding of Eisentrager was not

overruled until Rasul itself.  See id. at 490-94 (Scalia, J., dissenting).  Thus,

petitioners would have this Court construe the Suspension Clause so as to render the

statutory holdings of Ahrens and Eisentrager unconstitutional, and so as to

constitutionalize a view of habeas that, even as a statutory matter, was not even

arguable until 1973, and was not apparent until 2004.  No precedent whatever

suggests those breathtaking results.  Because petitioners are aliens outside the

sovereign territory of the United States, they have no constitutional rights under the Suspension Clause.

**C.**   Even if petitioners did have constitutional habeas rights under the Suspension Clause, the Detainee Treatment Act would be consistent with those rights. In Felker v. Turpin, 518 U.S. 651 (1996), the Supreme Court held that the significant habeas restrictions imposed by AEDPA do not effect an unconstitutional suspension. The Court stressed that "'the power to award the writ by any of the Courts of the United States, must be given by written law,'" id. at 664 (quoting Ex Parte Bollman, 8 U.S. (4 Cranch.) 75, 94 (1807)), and that "judgments about the proper scope of the writ are 'normally for Congress to make,'" ibid. (quoting Lonchar v. Thomas, 517 U.S. 314, 323 (1996)).  The Court concluded that AEDPA, which severely restricts the availability of successive petitions, fell "well within the compass of [the] evolutionary process" of permissible habeas adjustments.  Ibid.  Any other conclusion would inappropriately convert the Suspension Clause into a "one-way rachet" for petitioners.  See St. Cyr, 533 U.S. at 341 (Scalia, J., dissenting); id. at 326 (O'Connor, J., dissenting).[2]  Consistent with these principles, the Supreme Court has held that Congress may freely repeal habeas jurisdiction, at least if it affords an adequate and

---

[2] As noted above, the St. Cyr majority did not address this point, but resolved the case on other grounds.  See 533 U.S. at 304-05.

effective substitute remedy.  See Swain v. Pressley, 430 U.S. 372, 381 (1977).  And

petitioners all but concede that the judicial review provided under Section 1005(e)(2)

would itself be constitutionally sufficient if CSRT procedures gave them an adequate

opportunity to contest their designation as enemy combatants.  Al Odah Supp. Br. at

14.

Under these standards, Section 1005(e)(2) is more than constitutionally

sufficient.  As explained in our merits briefs, the CSRT procedures more than satisfy

any applicable Due Process requirements for holding aliens abroad as enemy

combatants during wartime.  For the same reason, they would more than satisfy any

procedural requirements implicitly incorporated into the Suspension Clause.   In

Swain, for example, the Court held that, because there is no Article III or Due Process

right to a life-tenured judge in a criminal trial, the failure to provide one likewise does

not violate the Suspension Clause.  See 430 U.S. at 382-83.  In any event, to the

extent that petitioners have concerns about the legal adequacy of the CSRT standards

and procedures, they may squarely raise those claims under the Act, which permits

review of "whether the use of such standards and procedures to make the [enemy

combatant] determination is consistent with the Constitution and laws of the United

States."  § 1005(e)(2)(C)(ii).  Indeed, petitioners also may seek review of whether a

CSRT determination was consistent with tribunal standards and procedures,

§ 1005(e)(2)(C)(i) – a category of claims that prior habeas law would have denied them even in the context of capital convictions. See Yamashita v. Styer, 327 U.S. 1, 23 (1946) ("the [military] commission's rulings on evidence and on the mode of conducting these proceedings against petitioner are not reviewable by the courts, but only by the reviewing military authorities").

Petitioners further err in contending that the Act is an unconstitutionally inadequate substitute for habeas review because it denies them the right to de novo judicial factfinding. Even in much less sensitive contexts than here, habeas courts do not find facts, but rather engage in highly deferential sufficiency review. See Jackson v. Virginia, 443 U.S. 307, 320-24 (1979). At common law, habeas courts did not even do that, given the longstanding rule that the truth of the custodian's return could not be controverted. See, e.g., Opinion on the Writ of Habeas Corpus, Wilm 77, 107, 97 Eng. Rep. 29, 43 (H.L.1758); Note, Developments in the Law – Federal Habeas Corpus, 83 Harv. L.Rev. 1038, 1113-1114 (1970) ("From 1789 to 1867, the period during which, with minor exceptions, federal habeas corpus extended only to federal prisoners, the federal habeas court did not hold fact hearings. The facts asserted in the return to the writ had to be accepted despite the prisoner's attempt to controvert them."); Oaks, Legal History in the High Court--Habeas Corpus, 64 Mich. L. Rev. 451, 453 (1966). And in the specific context of habeas review of military tribunals

during armed conflict, that traditional rule still applies with full vigor.  See Yamashita, 327 U.S. at 8 ("If the military tribunals have lawful authority to hear, decide and condemn, their action is not subject to judicial review merely because they have made a wrong decision on disputed facts."); Ex parte Quirin, 317 U.S. 1, 25 (1942) ("We are not here concerned with any question of the guilt or innocence of petitioners.").

The only possible basis on which petitioners could distinguish these cases is to contend that the CSRTs themselves are not authorized to make enemy combatant determinations in the first instance.  That claim is foreclosed by Hamdi v. Rumsfeld, 542 U.S. 507 (2004), in which the controlling opinion made clear that, consistent with longstanding practice under the Geneva Convention, the governing procedural requirements for enemy combatant determinations – even as to citizens in this country – "could be met by an appropriately authorized and properly constituted military tribunal."  Id. at 538 (plurality opinion).  Today petitioners' claim is even less substantial, because the Detainee Treatment Act specifically ratifies the use of these very CSRTs, subject to review of individual decisions in this Court under deferential standards.  For authorization purposes, CSRTs are now as fully legitimate as the military commissions appropriately given broad latitude in Quirin, Yamashita, and Hamdan v. Rumsfeld, 415 F.3d 33 (D.C. Cir. 2005), cert. pending (No. 05-184).

Factual inquiry is also not permitted in other habeas contexts.  For example, in the immigration context, the Court has long upheld habeas review restricted to claims of legal error.  See Gegiow v. Uhl, 239 U.S. 3, 9 (1915).  "In such cases, other than the question whether there was some evidence to support the order,  the courts generally did not review factual determinations made by the Executive."  INS v. St. Cyr, 533 U.S. 289, 306 (2001) (citation and footnote omitted).  This is why the elimination of habeas review over immigration decisions – and, as to specified criminal aliens, the grant of court-of-appeals review limited to legal claims in the Real ID Act – raises no Suspension Clause issue.  See Gittens v. Menifee, 428 F.3d 382, 387 n. 5 (2d Cir. 2005).

For all of these reasons, the exclusive-review scheme afforded by the Act is more than adequate for Suspension Clause purposes.

## III.  THIS COURT SHOULD DETERMINE THE MERITS OF PETITIONERS' CONSTITUTIONAL AND AUMF CLAIMS, WHICH ARE WITHIN ITS EXCLUSIVE JURISDICTION

Because the Act applies to these cases, the district courts have lost any continuing jurisdiction, and this Court's jurisdiction arises, if at all, only under Section 1005(e)(2).

This Court can and should convert the pending appeals into petitions for review under Section 1005(e)(2).  In an analogous circumstance, other courts of appeals

converted pending habeas appeals into petitions for review under the REAL ID Act.

See, e.g., Bonhometre v. Gonzales, 414 F.3d 442, 446 (3d Cir. 2005); Gittens v.

Menifee, 428 F.3d 382, 384-386 (2d Cir. 2005) (per curiam); Alvarez-Barajas v.

Gonzales, 418 F.3d 1050, 1052-53 (9th Cir. 2005); Rosles v. BICE, 426 F.3d 733,

736 (5th Cir. 2005) (per curiam).   Moreover, converting these habeas appeals into

petitions for review under Section 1005(e)(2) would be most consistent with

Congress's decision to apply that provision to covered claims "pending on" the date

of its enactment.   § 1005(h)(2).   Consistent with that decision, Congress expressly

contemplated that pending cases would be converted.   See, e.g., 151 Cong. Rec.

S14256, S14263 (Dec. 21, 2005) (Sen. Graham) ("regarding the modification of the

jurisdiction of those courts currently hearing individual habeas or other actions that

have been filed by the detainees, we wanted those cases to be recast as appeals of

their CSRT determinations"); 152 Cong. Rec. S970, S973 (Feb. 9, 2006) (Sen. Kyl)

("rather than requiring that pending cases be dismissed, the new law allows courts to

consider those cases as requests for review under the new standards and, where

necessary, transfer them to the appropriate forum").

Section 1005(e)(2)(C) sets forth the scope of review now applicable to these

cases.  It permits this Court to determine:

   (i) whether the status determination of the Combatant Status Review Tribunal with regard to such alien was consistent with the standards and procedures specified by the Secretary of Defense for Combatant Status Review Tribunals (including the requirement that the conclusion of the Tribunal be supported by a preponderance of the evidence and allowing a rebuttable presumption in favor of the Government's evidence); and

   (ii) to the extent the Constitution and laws of the United States are applicable, whether the use of such standards and procedures to make the determination is consistent with the Constitution and laws of the United States.

§ 1005(e)(2)(C).

Section 1005(e)(2)(C)(ii) permits review of the constitutional and statutory issues raised in these appeals: whether the Due Process Clause of the Fifth Amendment applies to the Guantanamo Detainees; if so, whether the CSRT procedures satisfy due process; and whether the President was authorized to detain petitioners as enemy combatants pursuant to Article II of the Constitution and the AUMF.  See Al Odah Br. at 22-60; Boumediene Br. at 14-27, 43-54.  These issues have been exhaustively briefed and argued to this Court.  All parties involved would benefit from their prompt resolution by this Court.

We do not believe that Section 1005(e)(2)(C)(ii) permits review for treaty claims.  That provision limits review to the question whether the standards and procedures used by the CSRTs are "consistent with the Constitution and laws of the United States,"  to the extent the "Constitution and laws of the United States" are

applicable.  In contrast, the habeas statute permits review of claims that a petitioner is being held "in violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2241(c)(3).  Accordingly, this Court should dismiss petitioners' various treaty-based claims.[3]

The Government recognizes that the detainees as yet have had no fair opportunity to raise claims within the scope of Section 1005(e)(2)(C)(i).  After this Court resolves the legal issues discussed above, we would not object if it were to afford petitioners an opportunity to raise any additional claims they may have under that provision.

Finally, because the Act eliminates any further basis for the exercise of district court jurisdiction, this Court should vacate the district court judgments and order dismissal of the petitioners' habeas cases in the district court for lack of jurisdiction. See United States v. Munsingwear, Inc., 340 U.S. 36, 39-40 (1950) ("The established

---

[3]  This Court need not reach the question whether the Act permits review of treaty claims.  We recognize that Steel Co., 523 U.S. at 94-101, requires the courts to decide jurisdictional questions before they decide merits ones.  Although cast in jurisdictional terms, it is unclear whether the "scope of review" provisions in the Act bear on subject-matter jurisdiction for Steel Co. purposes.  In any event, a threshold ruling that the treaties are not judicially enforceable would be permissible, both because judicial enforceability is itself not a merits determination, see Steel Co., 523 U.S. at 100-01 n.3, and because, given this Court's binding decision in Hamdan, the treaty claims are now (as a matter of circuit precedent) wholly insubstantial, see CRLP v. Bush, 304 F.3d 183, 193-94 (2d Cir. 2002).

practice of the Court in dealing with a civil case from a court in the federal system which has become moot while on its way here or pending our decision on the merits is to reverse or vacate the judgment below and remand with a direction to dismiss."); Ramallo v. Reno, 114 F.3d 1210, 1213-14 (D.C. Cir. 1997) (analogizing to Munsingwear and holding that vacatur of the district court judgment was proper where statute depriving district court of jurisdiction was enacted only after the district court's entry of judgment).

## CONCLUSION

For the foregoing reasons, this Court should convert the pending appeals into petitions for review under Section 1005(e)(2), proceed to decide the pending legal questions to the extent permitted by Section 1005(e)(2)(C)(ii), and order dismissal of the pending district court cases for want of jurisdiction.

Respectfully submitted,

PAUL D. CLEMENT
 *Solicitor General*

PETER D. KEISLER
 *Assistant Attorney General*

GREGORY G. KATSAS
 *Deputy Assistant Attorney General*

DOUGLAS N. LETTER
  (202) 514-3602
ROBERT M. LOEB
  (202) 514-4332
CATHERINE Y. HANCOCK
  (202) 514-3469
 *Attorneys, Appellate Staff*
 *Civil Division, Room 7268*
 *U.S. Department of Justice*
 *950 Pennsylvania Ave., N.W.*
 *Washington, D.C.  20530-0001*

FEBRUARY 2006

## CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)(C)
## OF THE FEDERAL RULES OF APPELLATE PROCEDURE

I hereby certify, pursuant to Fed. R. App. P. 32(a)(7)(C) and D.C. Circuit Rule 32(a), that the foregoing brief is proportionally spaced, has a typeface of 14 point and contains 12,893 words (which does not exceed the applicable 14,000 word limit).

_____

Catherine Y. Hancock

## CERTIFICATE OF SERVICE

I hereby certify that on February 17, 2006, I filed and served the foregoing Supplemental Brief of the Federal Parties Addressing the Detainee Treatment Act of 2005 by causing an original and fourteen copies to be delivered to the Court via hand delivery, and by causing two paper copies to be delivered to lead counsel of record via Federal Express (or hand delivery) and e-mail transmission:

Tom Wilner
Neil H. Koslowe
SHEARMAN AND STERLING LLP
801 Pennsylvania Avenue, NW, Suite 900
Washington, DC 20004
(202) 508-8000
Email: Twilner@shearman.com
Email: neil.koslowe@shearman.com

Stephen H. Oleskey
Melissa A. Hoffer
Mark Fleming
Wilmer Cutler Pickering Hale and Dorr LLP
60 State Street
Boston, MA 02109
(617) 526-6000
Melissa.Hoffer@wilmerhale.com
Mark.Fleming@wilmerhale.com

Douglas F. Curtis
Wilmer Cutler Pickering Hale and Dorr LLP
339 Park Ave.
New York, NY 10022
(212) 230-8800
Douglas.Curtis@wilmerhale.com


_____
Catherine Y. Hancock